FENESTRA, INC., Respondent, v. MERLE PATNODE COM-
PANY, Appellant.

*No. 13. Argued October 3, 1968.—Decided October 29, 1968.*
(Also reported in 162 N. W. 2d 23.)

454

For the appellant there was a brief and oral argument by *Phillip Berman* of Milwaukee.

No brief or appearance for respondent.

WILKIE, J.  Two issues are presented on this appeal:

(1) Whether the findings of the lower court were against the great weight and clear preponderance of the evidence.

(2) Whether the parol-evidence rule required the exclusion of the letter of June 9, 1966.

The contract involved is the purchase order of defendant-appellant to the plaintiff-respondent. Appellant contends that the trial court should have dismissed the complaint of the plaintiff because it did not comply with the above contract.

The purchase order reads, "Fenestra 'D' Panel as per plans and specifications Roof Decking." Thus the plans

and specifications were sufficiently identified on the purchase order to incorporate them into that contract. The plans and specifications represent the contract between defendant-appellant (the general contractor), and the G. S. A.

The section of the specifications with which this case is concerned is as follows: Section 11, Steel Roof Deck, which provides, in part, that:

"11–1. General:
"a. New steel roof deck units shall match existing steel roof deck units used in present marquise as to manufacturer, size, gage and installation unless otherwise specified herein.
". . .
"11–2. Shop Drawings
"a. Shop drawings, including erection layouts, shall be submitted to the Service for approval."

Shop drawings are governed by subsection 1–20 of Section 1, General Conditions. It reads, in part, as follows:

"(f) The approval [by G. S. A.] of drawings and schedules will be general, but approval shall not be construed: (1) As permitting any departure from the contract requirements; (2) as relieving the Contractor of the responsibility for any errors, including details, dimensions, materials, etc.; (3) as approving departures from full-size details furnished by the Contracting Officer, except as otherwise provided herein."

The term "contractor" refers to the general contractor, the defendant-appellant. This is made clear by Section 1, General Conditions, under 1–1. Definitions, which defines "contractor":

"(e) The term 'Contractor' as used in the specifications shall mean the individual, partnership, or corporation that agrees to provide all labor, material and services required in the contract."

The general notes on the blueprints (also part of the contract) provide that:

"1. Contractor shall verify all lines, dimensions, grades, and conditions at site before starting any part of work.

"2. All new work shall match existing sound similar work when new unless otherwise specified or noted."

Appellant argues that since the plans and specifications are part of the contract, the plaintiff-respondent assumed the obligation of the defendant general contractor with regard to the work to be performed as to the roof decking. Appellant relies on Corpus Juris Secundum,[1] which states that:

". . . Where the subcontractor undertakes to perform a portion of the contract work according to plans and specifications binding on the general contractor, such plans and specifications become a part of his contract, and he assumes the obligation of the general contractor in relation to the particular part of the work to be performed.

"The subcontractor, however, is not bound by any part of the specifications which is not applicable to his subcontract and the purposes thereof; nor is he bound by specifications furnished for the guidance of bidders for the original contract, but which are not found in a subcontractor's specifications and contract, and not specifically referred to therein."

Thus appellant submits that plaintiff assumed the obligation of the defendant to match the roof deck in question with existing roof deck and also, according to the general note on the blueprint, to verify all dimensions at the site before starting any work. The substance of appellant's argument is that the plaintiff should have had measurements verified by on-site inspections. Assuming, without deciding, that appellant's contentions are correct, did the plaintiff meet this obligation?

After Charles Ackley got the blueprints and specifications from defendant he constructed shop drawings from these blueprints. The blueprints clearly showed that the

[1] 17A C. J. S., *Contracts*, pp. 269, 270, sec. 327 (2) *b*.

458

length of the panel to be furnished was 17 feet plus the distance that the panel projected into the wall. The blueprints showed that the wall was eight inches thick and the panel appeared to go halfway into the wall. Therefore, Charles Ackley concluded that the total length of the panel should be 17 feet four inches as indicated in the shop drawings. Thereafter he sent six copies of the shop drawings to the defendant who sent them on to the G. S. A. for approval in accordance with the subsection on shop drawings, *supra*. (Approval of G. S. A. not binding as to dimensions.) However, in plaintiff's letter to defendant at that time, plaintiff specifically asked that the defendant general contractor "verify the cut length of the panels and all dimensions shown on the drawings."

Although the specifications and plans had not yet become a part of the contract between the parties by incorporation in the purchase order, they had been used and relied on by the plaintiff. Plaintiff obviously recognized that the dimensions on the shop drawings had to be verified—as required in the specifications and plans that subsequently became part of the contract. Mr. Ackley testified at the trial that it was not the general practice in the construction field for a material supplier to go to a jobsite at a considerable distance from his place of business.

In view of the distance involved, the amount of money involved in the purchase, and the custom in the trade, it was reasonable that the plaintiff-materialman wrote to the general contractor to verify the dimensions. It was reasonable for the plaintiff to conclude that the general contractor would have someone on the job who could make the on-site measurements. Also, it should be noted that the specifications and plans did not require any particular party to make the actual measurement, they only required that the measurement be made.

John Skiffington, regional manager for the plaintiff, testified as to the practice in the trade with regard to on-site measurements:

"*A.* The general custom is to make a shop drawing and have the general contractor check them. It's always been as far as I know.

"*Q.* All right. Now, what about is there any general custom with regard to a material supplier making measurements on site? *A.* If you were to attempt to make measurements on site, you would have to wait for the construction to be completed to that phase, and then it would be possible to do so. In looking at the detail here, there is a plate placed in a wall. We would not know where that plate would be unless it was placed. Therefore, you could not order the material from the manufacturing standpoint until the wall were in and completed with the bearing plate, the steel beam and so on. And at that stage of the game, if the practice is not to do that sort of thing, it's up to the general contractor to correlate the trades and to establish these dimensions prior to his actual building them, because otherwise he'd never get the building done if you had to wait for measurement in the field on an engineering product. He'd be in pretty tough shape."

The procedure used by Mr. Ackley was proper—both as to the terms of the contract and as to the practice in the trade.

On direct examination, Mr. Ackley was asked whether he received any verification from the defendant in response to the letter of June 9, 1966.

"*Q.* Did you get an answer to the question, or any statement, from the Patnode Company as to the last sentence of the first paragraph of this letter, Exhibit 13, that we are talking about?

" . . .

"*A.* I had called the Patnode Company asking if we could now proceed with the fabrication of the deck.

" . . .

"*Q.* When did you make that call?

"...

"*A*. It would have been shortly after receiving the approved drawings because I then ordered everything to Fenestra for fabrication.

"*Q*. (By Mr. Mann) Do you remember who you talked with at the Patnode Company? *A*. My only dealings were with Mr. Kiser.

"...

"*Q*. Now, what did you ask him regarding—if anything—regarding the dimensions of the working drawings? *A*. I asked if we could now proceed with the fabrication of this—of the deck per this drawing and all the dimensions verified, and he said yes."

The conduct on the part of the plaintiff was sufficient, as the trial court found, to permit a conclusion that plaintiff complied with the contract. Its findings of fact to that effect are clearly not against the great weight and clear preponderance of the evidence.

Appellant additionally argues that the parol-evidence rule precludes the introduction of the letter of June 9, 1966. Appellant argues that the letter preceded the contract and varied the terms of the contract in that it shifted the obligation to verify the panel dimensions from the plaintiff to the defendant.[2]

But, assuming appellant's contention as to the materialman's duty under the contract to be correct, the duty was to verify the dimensions by on-site measurements. Clearly, the letter was no more than a means, in conformity with the custom in the trade, of making that verification. Thus the letter of June 9, 1966, was clearly in conformity with the subsequently executed contract rather than a modification of it.

*By the Court.*—Judgment affirmed.

[2] *Air Power Equipment Corp. v. Telemark Co.* (1967), 34 Wis. 2d 699, 705, 150 N. W. 2d 457.